**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**


DALE OLIVER                                          PLAINTIFF/COUNTER-DEFENDANT


v.                                    CASE NO. 5:17-CV-5129

BRUCE JOHANSON; BLAIR
JOHANSON; and DB SQUARED, LLC.          DEFENDANTS/COUNTER-CLAIMANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

Currently before the Court are two dispositive motions and related filings. The first motion is Plaintiff and Counter-Defendant Dale Oliver's Motion for Partial Summary Judgment (Doc. 29), and a Statement of Facts (Doc. 30) and Brief in Support (Doc. 31). Oliver's Motion seeks, *inter alia*, a declaration that Oliver is still a one-third owner of DB Squared, LLC, a limited liability company he formed alongside Bruce and Blair Johanson.[1] Defendants Bruce Johanson, Blair Johanson, and DB Squared, LLC (collectively, "DB Squared" or the "Company") have filed a Response in Opposition (Doc. 45). The second pending motion is DB Squared's Motion for Partial Summary Judgment (Doc. 35), and a Statement of Facts (Doc. 36) and Brief in Support (Doc. 37). DB Squared's Motion seeks, *inter alia*, a declaration that it is the true owner of the copyright to the software. Oliver has submitted a Response in Opposition (Doc. 47). For the reasons explained below, Oliver's Motion for Partial Summary Judgment is **GRANTED**, and DB Squared's Motion for Partial Summary Judgment is **DENIED**.

---

[1] Indeed, the LLC was named DB Squared after combining the first initials of each of its founding members.

1

## I. BACKGROUND

This case centers around a once-thriving business relationship that soured after more than a decade. Prior to their association with Plaintiff Oliver, brothers Bruce and Blair Johanson ("the Johansons") operated a firm, Johanson Consulting, Inc. As part of their work, the Johansons employed a methodology related to job valuation and employment compensation. However, as neither brother was an expert in computer code, the need soon arose for the addition of an individual who *was* an expert in computer programming to make the method commercially viable. Fortunately, Johanson Consulting had worked with just such a computer programmer, Oliver, in the past, and the three ultimately decided to go into business together to develop and commercialize computer software related to compensation management planning and advising.

To achieve these goals, Oliver and the Johansons formed DB Squared as an Arkansas limited liability company on March 16, 2005, executing an Operating Agreement on the same day. The Operating Agreement provided that each of the three members would own a third of the membership interests in the newly formed LLC. Given their backgrounds, the work of the newly established company would be divided according to the owners' expertise, with the Johansons being primarily responsible for client relationships and Oliver serving as the strategy and product development leader.

Although the parties dispute the state of the existing program before Oliver began his work,[2] it is undisputed that, by 2008, an improved version of the program, entitled

---

[2] Oliver's Response to Defendants' Statement of Undisputed Material Facts (Doc. 46) disputes the proprietary nature of the JESAP method and Defendants' contention that the JESAP software, or a version of it, was in existence before Oliver began his work for DB Squared. However, the registration application and the certificate of registration notes that

JESAP 2008, had been created. The parties then sought to register the program with the U.S. Copyright Office.

On March 27, 2008, Oliver filed a registration application with the Copyright Office. (Doc. 35-6). In the application, Oliver identified himself as a principal of DB Squared but also checked the box indicating he was the "Author" of the JESAP software. After receiving an email from Tamika Butler, a Registration Specialist at the Copyright Office, noting the inconsistency between his claim of authorship and his title as an officer of the Company and after communicating with the Johansons, Oliver ultimately requested that Ms. Butler "[m]ake the application a "work made for hire" for the company DB Squared, LLC. (Doc. 35-7, p. 2). The copyright application for the JESAP 2008 software was then approved, and the registration record listed the work as a work made for hire and DB Squared as the author of the copyright (the "JESAP 2008 Copyright"). (Doc. 35-8, p. 2).

The timeline following the registration of the JESAP 2008 program is disputed, but some of the key dates and facts are clear. Following the registration of the JESAP 2008 Copyright, newer versions of the software were created, and the program was ultimately renamed DBCompensation in 2009 or 2010 as part of the company's rebranding efforts to make the software more commercially viable. As apparent from the record, many iterations of the JESAP and later DBCompensation products prominently displayed a message reading: "© DB Squared, LLC." As the member with computer programming expertise, Oliver was responsible for changing the computer code so that these copyright

---

the original JESAP software version was created in 2001. *See* Docs. 35-6, p. 3; 35-8, p. 2.

registration notices would be displayed when users accessed the software. (Doc. 35-11, p. 4).

Subsequent to this rebranding effort, newer versions of the DBCompensation software were created and Oliver and the Johansons, on behalf of DB Squared, made considerable efforts to sell, market, or license the software program DBCompensation to potential buyers. Oliver testified that as late as June 2016, he attended the World at Work conference in order to sell the DBCompensation product on behalf of DB Squared. (Doc. 35-4, p. 45).

Although the reasons are unclear, on October 24, 2016, Oliver submitted an email to the rest of the company announcing that he was resigning from DB Squared effective immediately. (Doc. 35, Ex. 14). At the time of his resignation, Oliver was the Chief Technology Officer ("CTO") of DB Squared. Blair Johanson responded by email to Oliver's resignation on October 26. His email noted that he understood Oliver's frustration with trying to finalize the newest version of the DBCompensation software, DBComp 10, but would like the opportunity to discuss the resignation with Oliver. He also asked if there was a way to get over this hurdle and move forward with the Company's strategic growth plan. (Doc. 35-14, p. 2). On October 30, 2016, Oliver sent another company-wide email apologizing for his odd behavior the week before. In the email, Oliver noted that he had been trying so hard to bring DBComp 10 to a successful conclusion and that, if desired, "[he] will be pleased to temporarily continue on at DB Squared to see DBC 10 through to a successful conversion, testing, implementation, and conclusion." (Doc. 35-16, p. 2). Moreover, he noted that "[o]nce the DBC 10 rollout has concluded (provided you decide that it would be helpful to have me back on the team until then) it seems like this presents

an excellent opportunity for me [to] let Blair and Bruce take it from here. DB Squared is at a terrific place now with so many excellent things put in place, and with a very bright future ahead. Removing the cost of my services will free up additional financial resources for the company." *Id.*

The extent to which Oliver actually returned to "the team" is unclear to the Court, but sometime in the next four months, Oliver began to assert that he was the sole owner of the DBCompensation software. As a result, he retained attorneys who then sent at least one cease-and-desist letter on his behalf to DB Squared alleging that, in the absence of the Company obtaining a license from Oliver or his wholly owned company, Applied Computer Technology ("ACT"), he would have no choice but to begin litigation to vindicate his ownership interests in the copyright and DB Squared.[3] (Doc. 35-19, p. 2).

In February 2017, Oliver submitted a new copyright registration to the Copyright Office for the DBCompensation software. In the application, he listed himself as the author of the copyright and indicated that, unlike his application for the JESAP 2008 software, this was not a work made for hire. In support of his application, Oliver submitted a number of pages of source code to the Copyright Office after first inserting "Author" and "Dale Oliver" on the pages. (Doc. 35-4, p. 35). As Oliver stated during his deposition, those insertions were not native to the copy of the program stored at DB Squared. *Id.* The copyright application was ultimately approved, and copyright TX 8-299-255 was issued

---

[3] Applied Computer Technology is a corporation wholly owned by Oliver. Oliver contends that although he was a one-third owner of DB Squared, he performed the computer programming work necessary to create JESAP and later DB Compensation as an independent contractor with ACT and, therefore, that the work made for hire doctrine does not apply.

on February 21 for the DBCompensation software, listing Oliver as the sole author (the DBCompensation Copyright").

Oliver then filed the present lawsuit, seeking, among other relief: (1) a declaration that he is still a member of DB Squared, LLC with a one-third membership interest; (2) judicial dissolution of the Company; (3) a declaration that he is the true author (and resulting owner) of the DBCompensation Copyright; and (4) damages for copyright infringement.

DB Squared filed a counterclaim seeking, among other things: (1) a declaration that the Company is the rightful owner of the copyrighted software in question, because Oliver's subsequent registration of the DBCompensation Copyright was procured by fraud on the Copyright Office, and thus invalid and/or unenforceable; (2) damages for infringement of the JESAP 2008 Copyright owned by DB Squared; and (3) damages for Oliver's alleged breach of a fiduciary duty.

## II. LEGAL STANDARD

The legal standard for summary judgment is well established. Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c);

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Even if certain facts are undisputed, the summary judgment standard also requires a demonstration that "'the movant [be] entitled to judgment as a matter of law.' Thus, the last matter that the court must address in ruling on a summary-judgment motion is whether legal theory or doctrine supports the movant's position that judgment should be entered." Charles A. Wright & Arthur R. Miller, 10A FEDERAL PRACTICE & PROCEDURE CIVIL § 2725.3 (Apr. 2018). While novel or complex legal issues should not forestall the grant of summary judgment that is otherwise appropriate under the Rules, "their presence in the action may suggest that a fuller development of the facts would be helpful to their resolution. In those circumstances, the court may deny summary judgment." *Id.*

### III. DISCUSSION

#### 1. Oliver's Motion for Partial Summary Judgment

Oliver's Motion is premised on the argument that his resignation from DB Squared did not eliminate his one-third ownership interest in the Company. In support of that argument, Oliver cites to Ark. Code Ann. § 4-32-802(c), which provides that:

> A member may withdraw from a limited liability company only at the time or upon the happening of an event specified in the articles of organization or an operating agreement. Unless the articles of organization or operating agreement provides otherwise, a member may not withdraw from a limited liability company prior to the dissolution and winding up of the limited liability company.

The only relevant provision in the operating agreement of DB Squared concerning cessation of membership is provided in Article IV, dealing with Management Certificates. *See* Doc. 31, Ex. 2, ¶ 4.2. That section provides that Members who own a Management Certificate and who propose to transfer their interests must comply with certain

obligations, including notifying the Company in writing of the "details and consideration for the proposed transfer or assignment." *Id.*

It is undisputed in this case that, while Oliver sent an email resigning his position as CTO of DB Squared, he never sent a written communication detailing a proposed transfer or assignment of his ownership interests in the Company. Therefore, Oliver argues, in the absence of notice of (much less actual) transfer or assignment, his mere resignation as CTO did not eliminate his membership interest in DB Squared.

DB Squared's response is that, while Oliver may not have *withdrawn* from the Company pursuant to the Operating Agreement, by operation of law, he ceased to be a member of the LLC when he filed the present Complaint and sought dissolution of the Company. In support, DB Squared cites to another provision of Ark. Code Ann. § 4-32-802 which contains a list of events which, upon their occurrence, terminate a member's membership in a LLC. *See generally* Ark. Code Ann. § 4-32-802 (noting that "a person ceases to be a member of a limited liability company upon the occurrence of one (1) or more" of the listed events). One of those events, listed in § 4-32-802(a)(4)(D), provides that, unless otherwise provided in writing in an operating agreement, an individual ceases to be a member of an Arkansas limited liability company when he "files a petition or answer seeking for the member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation." The Court finds that DB Squared's interpretation misconstrues the statute.

Indeed, while DB Squared focuses on the appearance of the phrase "dissolution" in the cited section, it glosses over the operative words, which are that the dissociation only occurs when a person "files a petition or answer *seeking for the member* any . . .

dissolution . . . ." (emphasis added).[4] Read in conjunction with the other subdivisions of Ark. Code Ann. § 4-32-802(a), the Court finds that section 802(a)(4)(D) is a prophylactic measure to protect the other members of an LLC when an entity-member of a limited liability company seeks liquidation, reorganization, or dissolution *for itself*, and is *not* directed to situations where a person brings an action for dissolution or liquidation *against* the limited liability company.

A review of the statutory language in the context of its surrounding sections confirms that this is the correct (and intended) interpretation. Ark. Code Ann. § 4-32-802(a)(4)(E) provides that a person ceases to be a member when he "[f]iles an answer or other pleading admitting or failing to contest the material allegations of a petition filed *against the member in any proceeding of the nature described in (a)(4)(D)* of this section." (emphasis added). This suggests that those proceedings listed in (a)(4)(D), including dissolution, are ones affecting the member and are not directed to petitions to dissolve the limited liability company itself. This also likely explains why there is no separate cross-reference here to Ark. Code Ann. § 4-32-901, which is the section on dissolution of the *limited liability company*.

DB Squared offers no authority in support of its interpretation, and indeed this Court can find no Arkansas cases that have interpreted this particular subsection.[5] But

_____

[4] A "member" is defined to include persons, which by the statutory definition include not only natural persons but also entities such as partnerships and corporations. Ark. Code Ann. § 4-32-102(10), (12). Therefore, it is natural to refer to a member-entity such as a corporation *seeking for itself* dissolution or liquidation.

[5] There appears to be only one case in Arkansas interpreting this section, but it involved a conflict between federal bankruptcy law and subsection 802(a)(4)(B), which is not helpful to the analysis here. *See In re Dixie Mgmt. & Inv. Ltd. Partners*, 474 B.R. 698 (Bankr. W.D. Ark. 2011).

courts in other states interpreting statutes with identical language have rejected the argument that cessation of membership occurs when the individual member seeks reorganization or dissolution of the company, rather than for *itself*. For instance, in *Crumpton v. Vick's Mobile Homes, LLC*, the relevant statute provided that:

> A person ceases to be a member of a limited liability company upon the occurrence of any of the following events:
>
> . . .
>
> (4) . . . the member (A) makes an assignment for the benefit of creditors; (B) files a voluntary petition in bankruptcy; (C) is adjudicated a bankrupt or insolvent; (D) *files a petition or answer seeking for the member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation*; (E) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the member in any proceeding of this nature . . . .

335 Ga. App. 155, 156 (2015) (citing OCGA § 14-11-601.1(b)). Just like in the case at bar, in *Crumpton*, a party contended that an individual who filed a petition seeking dissolution of the limited liability company ceased to be a member of the company upon the filing of that petition. The Georgia Court of Appeals rejected that argument, as the Court does here, because of the statutory language surrounding this provision and because the entire section, when read holistically, indicates a legislative intent to insulate remaining members of an LLC when an unexpected (or involuntary) event like death, bankruptcy, or liquidation occurs that affects the status or financial health of a member. *Id.* at 158. In coming to that decision, *Crumpton* cited other state courts in North Carolina and Ohio that, given similar or identical language, arrived at the same legal conclusion. *Id.* at 159.

DB Squared has not offered any alternative legal or factual reasons as to why or how Oliver forfeited his membership interest in the Company.[6]  Accordingly, the Court finds and concludes that Oliver has met his burden of demonstrating that there are no genuine disputes of material fact and that he is entitled to judgment as a matter of law on the question of his continued ownership share in DB Squared. Therefore, the Court **GRANTS** Oliver's Motion for Partial Summary Judgment (Doc. 29) and **DECLARES** as a matter of law that Oliver is a member and one-third owner of DB Squared.[7]

## 2. DB Squared's Motion for Partial Summary Judgment

DB Squared contends that it is entitled to summary judgment in the form of a declaration as to its ownership of the copyrighted software in question.  According to DB Squared, judgment as a matter of law is proper for three separate reasons: (1) Oliver contributed his (original) software development work to the company in exchange for an ownership share in the company, and generous disbursements since then; (2) Oliver's breach of the fiduciary duties he owed DB Squared are sufficient as a matter of law to cause all rights in the software to accrue to the Company; and (3) the version of the software rebranded as DBCompensation was a work made for hire that, pursuant to federal law, vests authorship (and ownership of the resulting copyright) in the Company. The Court finds that none of these reasons presently justify judgment in favor of DB Squared.

---

[6] DB Squared had previously suggested that Oliver's resignation as an officer of the Company constituted a forfeiture of his membership rights and interests, but it has (correctly) not relied on that argument in response to the present motion.

[7] Oliver also seeks dissolution of the Company under Arkansas law, but the appropriateness of that separate remedy is factually disputed and therefore reserved for trial.

First, the argument that ownership of the copyright belongs to DB Squared because Oliver agreed to contribute his (original) software development work to the company in exchange for his membership interest appears—at least on the summary judgment record—to be contrary to the Copyright Act ("the Act"). The Act provides that authorship of a copyright belongs initially to the author. 17 U.S.C. § 201(a). There is, of course, an important exception carved out of this rule for works made for hire. 17 U.S.C. § 201(b). Thus, to the extent that DB Squared's argument is that a business relationship alters the rules for determining initial ownership of the copyright, the Court finds no support for that proposition either in the Act or in any authority that has been cited in the briefs. If, alternatively, the argument is that the copyright, even if initially belonging to Oliver, was *transferred* by his actions (*i.e.* taking an ownership interest in exchange for his work), the Court is presently unpersuaded. The Act expressly provides that "[a] transfer of copyright ownership . . . is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204. Because of this requirement, courts have long held that "[t]o transfer ownership of a copyright, the parties must state in writing that they intend to transfer a copyright." *Saxon v. Blann*, 968 F.2d 676, 680 (8th Cir. 1992).

DB Squared's next argument is that Oliver breached his fiduciary duty to the Company when he acquired, in opposition to the corporation, property which the corporation has an interest in, in violation of what has been dubbed the "corporate opportunity doctrine." *Guth v. Loft*, 5 A.2d 503, 511 (Del. Ch. 1939) (defining the doctrine). DB Squared argues that when Oliver subsequently sought—and obtained—a copyright

in the DBCompensation software, he breached the duty he owed the corporation, and the ownership rights in the copyright should accrue to the corporation by default. DB Squared cites a single case, *Robinson v. R&R Publishing, Inc.*, 943 F. Supp. 18 (D.D.C. 1996), in support of this argument. While factually analogous in many ways, *Robinson* is insufficient, alone, to enable the Court to hold that ownership accrued to the Company as a matter of law.

There are two deficiencies in DB Squared's reliance on *Robinson*. The first is that the Court in *Robinson* did not address the authorship of the copyrighted work. Indeed, the Court held that "Robinson holds the copyright for Standards of Medical Care in trust for the corporation, *regardless of who authored the work within the meaning of the Copyright Act.*" *Robinson*, 943 F. Supp. at 22 (emphasis added). Unlike in *Robinson*, however, initial authorship/ownership is of paramount importance here. That is because, unlike *Robinson* where there was only one work and where no copyright in the work was registered, there are *two* registrations here, and the parties fundamentally disagree as to whether the second copyrighted software, DBCompensation, is materially different or a derivative work of the first, JESAP 2008. As a result, to the extent that it is later determined that DBCompensation is a derivative version of the first-registered JESAP 2008 Software, who holds the copyright is of the utmost importance because one of the rights conferred by the Act is the *exclusive* right to "prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). Of course, DB Squared argues that, following the reasoning of *Robinson*, the authorship of the copyright is irrelevant because of Oliver's breach of a fiduciary duty and, therefore, the copyright should be held in trust for the corporation,

regardless of initial authorship. That leads to the second problem with DB Squared's reliance on *Robinson.*

The *Robinson* court did not analyze whether the application of the "corporate opportunity doctrine" is altered or pre-empted by the Act. There is good reason to believe that it is. For, the Act provides that:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any state.

17 U.S.C. § 301(a). Of course, exceptions to this pre-emptive language are made for "activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright . . . ." 17 U.S.C. § 301(b)(3). Thus, whether the Act pre-empts DB Squared's reliance on the corporate opportunity doctrine is, at this point, not clear. Unfortunately, *Robinson* is not instructive because it made no mention of this language. Therefore, the Court cannot conclude that the corporate opportunity doctrine leads inexorably to the conclusion that ownership rights accrued to DB Squared.

Finally, DB Squared argues that the Court can conclude that the DBCompensation software developed by Oliver before he resigned from DB Squared was a work made for hire under the Act. As noted before, "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author . . . and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

A work made for hire is defined by the Act as "a work prepared by an employee within the scope of his or her employment" or "a work specifically ordered or commissioned for use as a contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101(1)-(2).The Supreme Court has indicated that, under the Act, a work made for hire "can arise through one of two mutually exclusive means, one for employees and one for independent contractors, and ordinary canons of statutory interpretation indicate that the classification of a particular hired party should be made with reference to agency law." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 742-43 (1989). Thus, "[t]o determine whether a work is for hire under the Act, a court first should ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor. After making this determination, the court can apply the appropriate subsection of § 101." *Id.* at 750-51. If the individual is an employee and prepared the work within the scope of his or her employment, the work qualifies as a work made for hire. 17 U.S.C. § 101(1). If, on the other hand, the individual is an independent contractor, then whether the work in question is a work made for hire depends upon whether it meets the requirements of 17 U.S.C. § 101(2). *Reid*, 490 U.S. at 753. That section requires that the work be one of a specifically enumerated list of nine categories *and* that there be an agreement of the parties in writing. Because there is no express agreement in writing here, to prevail on summary judgment, DB Squared must demonstrate that there is no genuine dispute of fact that Oliver was an employee acting within the scope of his employment when the DBCompensation software was created.

Following the Supreme Court's *Reid* decision, the analysis of whether the given individual was an employee or an independent contractor turns on factors such as: the skill required, the source of the tools used, the location of the work, the duration of the relationship between the parties, whether and to what extent the hiring party had the right to control or otherwise assign additional work or duties to the individual, the method of payment, whether the work was part of the regular business of the hiring party, and the tax treatment of the party. *Id.* at 751-52 (citations omitted). In making this determination, the Court must remember that "[w]hether a given individual is an employee or independent contractor is a question of law, which must be decided by reviewing the facts of each case." *Kirk v. Harter*, 188 F.3d 1005, 1007 (8th Cir. 1999) (quoting *Berger Transfer & Storage v. Cent. States*, 85 F.3d 1374, 1377 (8th Cir. 1996)).

While the parties have cited cases with closely analogous facts to the case at bar that came down on one side or the other of the employee/independent contractor question[8] and argue that the Court can, based on those decisions, decide what Oliver's employment status was during the critical time-period here, the Court's own consideration of these factors leads it to conclude that this question of law cannot be conclusively decided based on the record before it. That is because, contrary to the urging of the parties, the evidence submitted on the summary judgment record is supportive of both conclusions.

---

[8] *Compare* Doc. 37 pp. 14-16 (citing *JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010), where the Court held, given closely analogous facts, that there was the requisite employee-employer relationship necessary to qualify the copyrighted source code as a work made for hire) *with* Doc. 47, pp. 10-11 (citing *Woods v. Resnick*, 725 F. Supp. 2d 809 (W.D. Wis. 2010), a district court case discussing *JustMed* and coming to the opposite conclusion in a case with closely analogous facts).

<u>Factors Supportive of an Employment Relationship</u>:

- DB Squared owned many of the instrumentalities and tools used by Oliver to create, write, and improve the software.

- The duration of the relationship, including that Oliver was not only a founding member of the LLC but held various positions with the Company throughout his long tenure there.

- The fact that DB Squared was in business and that its primary asset was this software that the members of the Company, including Oliver, sought to sell to customers.

- Oliver's changing of the computer code in the DBCompensation software to reflect that the copyright was owned by DBSquared, LLC.

<u>Factors Supportive of an Independent Contractor Relationship</u>:

- Oliver was not a W-2 employee and payment is alleged to have been made to Oliver's wholly-owned firm, ACT, rather than to Oliver himself.

- The creation of the software required a high level of skill.

- Oliver partly worked from home and is alleged to have largely directed his own work given that the Johansons had no computer programming expertise.

Given the number of factors to be considered and the lack of evidence in the summary judgment record on certain of the factors, including the degree of control that the Company exercised over Oliver's work, the location of the work, whether and to what extent other projects were assigned to Oliver, the method of payment and DB Squared's role in hiring and paying assistants who admittedly worked on the project during this time, the Court cannot conclude that this question of law can be decided in DB Squared's favor at the present time. Because there are genuine disputes as to many of these factors,

summary judgment is inappropriate.[9] Of course, at trial, the parties will need to support their positions on Oliver's employment status by offering evidence on these factors.

Beyond the disputed issue of Oliver's employment status, summary judgment is also inappropriate because of other outstanding questions. As the Court noted in the previous section, one of the exclusive rights provided to copyright owners under the Act is the right to make derivative works. The summary judgment record—including the reports of the parties' respective experts in this case—reveals that there is still a serious dispute as to whether—and to what extent—the DBCompensation software is a derivative work of the earlier JESAP program. Oliver himself admits that the DBCompensation software, for which he sought and received a copyright, shares computer code with the JESAP software. (Doc. 35-4, p. 25). If the ultimate determination is made that DBCompensation is a derivative work of JESAP, and DB Squared holds the copyright to the JESAP software, then only *it* would have the authority, absent granting a license to another entity, to create derivative works. That would, of course, implicate a number of claims in this case—including the claims for declaratory relief as to the ownership and/or validity of the DBCompensation Copyright, and the competing claims for copyright infringement.

---

[9] The Court would note here that there is a need for further input from the parties as to whether the Court or the jury should decide the question of Oliver's employment status at the time the DBCompensation software was created. Although the *Kirk* case from the Eighth Circuit held that the ultimate determination of employment status was a question of law, it also noted that the question of employment status is sometimes, as it was in that case, submitted to the jury. *Kirk*, 188 F.3d at 1007. Other circuits vary as to whether (and if so, how) these questions are submitted to the jury. *See, e.g.*, 9TH CIR. CIV. JURY INSTR. 17.9 (2017).

Therefore, because there are genuine disputes—as to Oliver's employment status and the extent to which DBCompensation is a derivative work—that would ultimately affect ownership and whether infringement has occurred, DB Squared's Motion for Partial Summary Judgment is **DENIED.**

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff Dale Oliver's Motion for Partial Summary Judgment (Doc. 29) is **GRANTED**.

**IT IS FURTHER ORDERED** that Blair Johanson's, Bruce Johanson's, and DB Squared, LLC's Motion for Partial Summary Judgment (Doc. 35) is **DENIED**.

**IT IS SO ORDERED** on this ⟨29th⟩ day of June, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE