**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**DALE OLIVER**                                    **PLAINTIFF/COUNTER-DEFENDANT**


**v.**                              **CASE NO. 5:17-CV-5129**

**BRUCE JOHANSON; BLAIR**
**JOHANSON; and DB SQUARED, LLC**         **DEFENDANTS/COUNTER-CLAIMANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

On July 25, 2018, the above-captioned matter came on for a bench trial before the Court. Over the next three days, the Court heard testimony from witnesses and received exhibits into evidence. At the conclusion of the trial, the Court directed the parties to submit post-trial briefing on several issues. Those briefs were submitted on August 14, 2018. *See* Docs. 66, 67. Having received and reviewed the evidence and briefs submitted in this case, the Court issues the following Memorandum Opinion and Order setting out its findings of fact and conclusions of law and its rulings on the remaining claims.

## I. BACKGROUND

### A. FACTUAL BACKGROUND[1]

This case centers around a once-thriving business relationship that soured after more than a decade. Prior to their association with Plaintiff Dale Oliver, brothers Bruce and Blair Johanson ("the Johansons") operated a firm, Johanson Consulting, Inc. (d.b.a. Johanson Group and hereinafter "Johanson Consulting"). As part of their work, the

---

[1] This section is designed to give a brief overview of the factual background of this case. More specific and detailed factual findings relevant to the Court's resolution of the remaining claims are set out in the "findings of fact" section below.

1

Johansons employed a methodology known as the Job Evaluation and Salary Administration Program ("JESAP"). The JESAP methodology had originally been developed in 1985 by the Johansons' father, a professor at the University of Arkansas school of business who opened the consulting business in 1973. At its core, the JESAP methodology was designed to enable a company to set up a fair and equitable compensation structure for its employees by using point-factor analysis, a technique that assigned particular weights to various factors relevant to overall employee compensation. This is a process that was employed in the industry, especially by the Hay Group, who led the field in the use of such a system for determining job compensation. The Johansons maintain, however, that the secret of their JESAP methodology lies in its unique consideration and differential weighting of various factors. In short, while two consulting groups could tell you that several factors were important, the specific factors employed by each group, the weight each group gave to their included factors, and the algorithms used to determine overall job compensation, could—and would—often vary considerably.

Initially, the Johansons had to perform tedious hand calculations to compute the results of their salary studies. This often meant that Johanson Consulting's reports to individual clients took a considerable amount of time to produce. As computing technology developed over time, the Johansons decided to develop a computer software program that incorporated their methodology and thus produce results much faster. Unfortunately, because neither brother had computer programming experience, the need

arose to hire someone who did. And this is where Mr. Oliver, a local computer programmer, enters the scene.[2]

In January of 2001, Oliver met with Blair Johanson to discuss streamlining Johanson Consulting's job salary studies. Oliver studied the JESAP methodology and agreed to help create the software program. Because it relied on the Johansons' JESAP methodology, the initial version of the software was entitled JESAP 2001. The automation of the program led to considerably faster processing times for the job studies that Johanson Consulting produced, so much so that their clients began to inquire about purchasing the software for their own internal use. Because of this customer demand, the three ultimately decided to go into business together to develop and commercialize computer software related to compensation management planning and advising.

To achieve these goals, Oliver and the Johansons formed DB Squared as an Arkansas limited liability company on March 16, 2005, executing an Operating Agreement on the same day. The Operating Agreement provided that each of the three members would own a third of the newly formed LLC. Given their backgrounds, the work of the newly established company would be divided according to the owners' expertise, with the Johansons being primarily responsible for client relationships and Oliver serving as the strategy and product development leader.

Continuous updates were made to the previous versions of the software, and by 2008, an improved version of the program, entitled JESAP 2008, had been created. The

---

[2] Oliver testified at trial that prior to his work with the Johansons, he had worked to develop software programs for other businesses. As part of that work, he had been involved with programs that had been registered with the U.S. Copyright Office.

parties then sought to protect the work by registering the software program with the U.S. Copyright Office.

On March 27, 2008, Oliver filed the registration application with the U.S. Copyright Office. Oliver signed and submitted the application in his capacity as an officer of DB Squared, but he also checked the box indicating he—individually—was the "Author" of the JESAP software. While processing the application, Tamika Butler, a Registration Specialist at the Copyright Office, sent an email to Olivier noting the inconsistency between his personal claim of authorship and his submission of the application on behalf of the Company. After first communicating with Blair Johanson, Oliver informed Ms. Butler that the application should list the program as work made for hire for the company DB Squared, LLC. The copyright application for the JESAP 2008 software was then approved, and the registration record lists the software as a work made for hire and DB Squared as the author of the copyright (the "JESAP 2008 Copyright").

Following the registration of the JESAP 2008 Copyright, newer versions of the software were created. And consistent with its new marketing strategy, the company also made the decision to rebrand the software, as people had trouble pronouncing "JESAP" and as the name of the program did nothing to identify it with the company. Thus, in 2009, the JESAP software was renamed DBCompensation. Unlike the earlier JESAP software, where editions of the program were indicated by the year of publication (*i.e.*, JESAP 2008), the various versions of the DBCompensation software were numbered sequentially (*i.e.*, DBCompensation 10 was the tenth version). To complete the rebranding effort, a new corporate logo was created and DB Squared applied for and obtained a trademark for the new name and logo. As apparent from the record and

testimony at trial, many iterations of the JESAP—and later DBCompensation—products prominently displayed a message reading: "© DB Squared, LLC." As the member of the LLC with computer programming expertise, Oliver was responsible for changing the computer code so that these copyright registration notices would be displayed when users accessed the software. After this rebranding effort, newer versions of the DBCompensation software were created and Oliver and the Johansons, on behalf of DB Squared, made considerable efforts to sell, market, and license the software program to potential clients.

However, lurking beneath the gloss of the company's new logo and latest version of the DBCompensation software product was Oliver's growing perception that the Johansons were more dedicated to the cause of their own consulting business (*i.e.* their separate revenue stream) than they were to maintaining and improving the DBCompensation software or DB Squared's value. On October 24, 2016, having exhausted his patience, Oliver submitted an email to the rest of the company announcing that he was resigning from DB Squared effective immediately. At the time of his resignation, Oliver was the Chief Technology Officer ("CTO") of DB Squared. Blair Johanson responded by email to Oliver's resignation on October 26. His email noted that he understood Oliver's frustration with trying to finalize the newest version of the DBCompensation software, DBComp 10, but would like the opportunity to discuss the resignation with Oliver. He also asked if there was a way to get over this hurdle and move forward with the Company's strategic growth plan. On October 30, 2016, Oliver sent another company-wide email apologizing for his odd behavior the week before. In the email, Oliver noted that he had been trying so hard to bring DBComp 10 to a successful

conclusion and that, if desired, "[he] will be pleased to temporarily continue on at DB Squared to see DBC 10 through to a successful conversion, testing, implementation, and conclusion." (Doc. 35-16, p. 2). But Oliver's longer-term intent remained the same:

> [o]nce the DBC 10 rollout has concluded (provided you decide that it would be helpful to have me back on the team until then) it seems like this presents an excellent opportunity for me [to] let Blair and Bruce take it from here. DB Squared is at a terrific place now with so many excellent things put in place, and with a very bright future ahead. Removing the cost of my services will free up additional financial resources for the company.

*Id.* The Johansons and DB Squared informed Oliver that they would carry on with the completion of the DBCompensation 10 program without Oliver's help. DB Squared separately informed Oliver that his resignation as CTO constituted a forfeiture of his one-third ownership interest in the company.

Soon thereafter, Oliver began to assert that he was the sole owner of the DBCompensation software. In furtherance of this position, he retained attorneys who sent at least one cease-and-desist letter on his behalf to DB Squared alleging that, in the absence of the company obtaining a license from Oliver or his wholly owned company, Applied Computer Technology ("ACT"), he would have no choice but to begin litigation to vindicate his ownership interests in the copyright and DB Squared.[3]

In February 2017, Oliver submitted a new copyright registration to the Copyright Office for the DBCompensation software. In the application, he listed himself as the author of the copyright and indicated that, unlike his application for the JESAP 2008 software, this was not a work made for hire. In support of his application, Oliver submitted several

---

[3] Oliver contends that although he was a one-third owner of DB Squared, he performed the computer programming work necessary to create JESAP and later DB Compensation as an independent contractor with ACT.

pages of source code to the U.S. Copyright Office after first inserting "Author" and "Dale Oliver" throughout. (Doc. 35-4, p. 35). Those insertions were not native to the copy of the program stored at DB Squared. The copyright application was approved on February 21, 2017, and copyright TX 8-299-255 was issued for the DBCompensation software, listing Oliver as the sole author (the DBCompensation Copyright").

## B. PROCEDURAL BACKGROUND

Oliver then filed the present lawsuit, seeking (1) a declaration that he is still a member of DB Squared, LLC with a one-third membership interest; (2) judicial dissolution of DB Squared; (3) a declaration that he is the true author (and resulting owner) of the DBCompensation Copyright; (4) damages for copyright infringement; and (5) a claim for unjust enrichment.

Defendants sought (1) a declaration that the Company is the rightful owner of the copyrighted software in question, because Oliver's subsequent registration of the DBCompensation Copyright was procured by fraud on the Copyright Office, and thus invalid and/or unenforceable; (2) damages for infringement of the JESAP 2008 Copyright owned by DB Squared; (3) damages for Oliver's alleged breach of a fiduciary duty; (4) injunctive relief to prevent Oliver from committing trade secret misappropriation by attempting to offer the DBCompensation software, which allegedly contains trade secrets, to others; (5) injunctive relief to prevent Oliver from using the software programming that comprises the content covered by the JESAP 2008 Copyright; (6) an accounting for any instances where Oliver attempted to sell or market the software at the center of this dispute; and (7) a declaration as to Oliver's ownership interest in DB Squared.

The parties then each submitted cross-motions for partial summary judgment. Oliver sought partial summary judgment on the ground that he remained a one-third owner of DB Squared despite his resignation from the company in October of 2016. Defendants sought partial summary judgment that they are the rightful owners of the DBCompensation software. They contended that ownership of the DBCompensation software vested in the company for three separate reasons: (1) Oliver contributed his software development work to the company in exchange for an ownership share in the company and generous disbursements since then; (2) Oliver's breach of the fiduciary duties he owed DB Squared were sufficient as a matter of law to cause all rights in the software to accrue to the company; and (3) the version of the software rebranded as DBCompensation was a work made for hire that, pursuant to the Copyright Act, vests authorship (and resulting ownership) in the company.

In a Memorandum Opinion and Order filed on June 29, 2018 (Doc. 52), the Court granted Oliver's motion for partial summary judgment and denied Defendants' motion. As to Oliver's motion, the Court declared as a matter of law that he remained a one-third owner of DB Squared. As to the Defendants' motion, the Court found that there remained genuine disputes of material fact that precluded the Court from deciding the ownership issue on the summary judgment record. As the Court remarked then, the first two arguments advanced by Defendants as to why DB Squared owned the copyright to the DBCompensation software appeared to be either directly contrary to the Copyright Act or at least arguably pre-empted by it. Finally, on the work for hire[4] question, the Court

---

[4] Following the Supreme Court's lead, the Court will "use the phrase 'work for hire' interchangeably with the more cumbersome statutory phrase 'work made for hire.'" *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 n.3 (1989).

indicated that many of the agency factors used to decide whether an individual was an employee or independent contractor at the time the work in question was created appeared split, such that determining the ultimate question of Oliver's status could not be decided based on the current record.

The Court's summary judgment opinion clarified the important issues that remained for trial. Chief among these issues were: (1) whether Oliver was an employee or an independent contractor during the time he authored the versions of the software at issue in this case; (2) whether the later DBCompensation 10 software was a derivative work of the earlier JESAP software; (3) whether one or both of the copyright registrations in this case (for the JESAP 2008 and DBCompensation software) were invalid either because of mistaken representations in the applications or fraud on the U.S. Copyright Office; and (4) whether Oliver or the Johansons breached the fiduciary duties they owed to DB Squared through their actions in this case. The answers to these questions would largely resolve the remaining claims in this case. The parties subsequently notified the Court that they intended to try the case to the bench. As noted above, the bench trial was held from July 25-27, 2018.

Having heard the evidence and considered the relevant law, the Court now issues the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[5]

---

[5] To the extent that any of the Court's findings of fact constitute conclusions of law, or mixed findings of fact/conclusions of law, the Court adopts those conclusions as if they had been restated as conclusions of law. The opposite also applies.

## II. DISCUSSION

## A. FINDINGS OF FACT

### The Johansons and Their Methodology

1. Before associating with Dale Oliver, Bruce Johanson and Blair Johanson operated a firm, Johanson Consulting. As part of their consulting business, the Johansons employed a methodology related to job valuation and employment compensation based on point-factor analysis. The compensation system is based on several job-related factors, each of which is associated with a specific value. While point-factor analysis is used by other companies in their consulting work, the specific factors and, more importantly, the specific values assigned to each factor is a secret that the Johansons sought to protect through the use of licensing and confidentiality agreements. (Def. Ex. 40). Oliver himself password-protected the software code (including the code that revealed the particular values that the Johansons assigned to the various factors) and obtained signed confidentiality agreements from individuals such as Chris Devine who would later work on the code.

2. The proprietary methodology, known as the Job Evaluation & Salary Administration Program ("JESAP"), was first developed by the Johansons' father in 1985 and has been continuously refined, improved, and used by Johanson Consulting since then.

3. Johanson Consulting owned trademarks to the JESAP name. (Def. Ex. 40). U.S. Patent and Trademark Office ("USPTO") records show that two registrations for the JESAP name (with different slogans beneath the JESAP title) were registered to

Johanson Consulting but were ultimately cancelled. Those registration numbers are 3326312 and 3650242.[6]

4. Prior to the automation of the process through the software at issue here, the Johansons had performed their job valuation calculations by hand and, later, using Microsoft Excel spreadsheets, word processors, and calculators.

### The Early Years/Versions of the Software

5. In 2001, Johanson Consulting contracted with Oliver to create and develop a computer software program known as JESAP 2001 that implemented the point-factor analysis method that the Johansons had been using previously. At some point during the relationship, Oliver and the Johansons decided that the automated software was commercially viable.

6. The JESAP software had many iterations that were named according to their year of completion. The first such version was created in 2001. There was also a 2005 version and, ultimately, the 2008 version that was registered with the U.S. Copyright Office.

7. As the only computer programmer working on the software until early 2007, Oliver was responsible for creating the software that incorporated the Johansons' JESAP methodology.

### DB Squared Formation

8. Oliver and Bruce and Blair Johanson formed DB Squared, LLC as an Arkansas limited liability company on March 16, 2005, for the primary purpose of developing

---

[6] Defendants' Exhibit 40 shows the "TM" symbol next to the JESAP name. The Court can take judicial notice of official records of administrative bodies, including USPTO records.

and commercializing computer software in the field of compensation management planning and advising.

9.  The Operating Agreement for DB Squared identified three owners, each having one-third ownership interests and proportionate management rights.

10. On August 24, 2006, DB Squared, LLC entered into a licensing agreement with Johanson Consulting. The licensing agreement mentions the JESAP methodology and notes that it has been referred to as JESAP since 1985. In the licensing agreement, Johanson Consulting grants to DB Squared an irrevocable, perpetual license to the JESAP Methodology, and DB Squared grants to Johanson Consulting an irrevocable, perpetual license to the JESAP software. (Def. Ex. 4).

### The 2008 Registration

11. On March 27, 2008, Oliver, using a DB Squared check (Pl. Ex. 14), filed an application for registration of the JESAP 2008 software with the U.S. Copyright Office. In the original application, Oliver listed himself as the "Author" of the JESAP 2008 software as well as a Principal of DB Squared. He therefore indicated that the work was not a work made for hire. (Pl. Ex. 1).

12. The copyright application for the JESAP 2008 software notes that the 2008 software includes pre-existing JESAP material from 2001, 2005, and 2006. (Pl. Ex. 2).

13. On June 29, 2009, Oliver received an email from Tamika Butler, a Registration Specialist at the U.S. Copyright Office, explaining the "work for hire" doctrine, its effect on authorship of the copyright, and inquiring about the appropriate designation of the work as either a work made for hire or a work owned exclusively by Oliver. The email also referenced and attached a Circular further explaining the doctrine. (Def. Ex. 3).

14. Oliver discussed the email with Blair Johanson. After doing so, he wrote back to Tamika Butler, stating in the email that he had read the attached materials and that the U.S. Copyright Office should note that the JESAP 2008 application was a work for hire for the company DB Squared. (Def. Ex. 3).

15. The U.S. Copyright Office approved the registration, and Registration TX 6-942-486 was approved for JESAP 2008, listing the software as a work made for hire with DB Squared listed as the author.

**Post-2008 History/Rebranding Efforts**

16. In 2009, after consulting with an advertising/branding company, and in light of customer comments that the term "JESAP" was confusing, hard to pronounce, and didn't signify who owned the software, the software was re-named DB Compensation. Unlike the JESAP versions, where the year of release was incorporated into the title, DB Compensation was named using the release number.

17. As part of the rebranding effort, DB Squared adopted a new logo, and the company applied for a federal trademark registration for the name "DBCompensation." The United States Patent and Trademark Office issued Registration No. 3,763,179 for "DBCompensation" to DB Squared, LLC (Def. Ex. 5).

**Work for Hire/Employer-Independent Contractor**

18. Both before and after the creation of DB Squared, Oliver was paid through his wholly-owned company, Applied Computer Technology, a business Oliver formed in 1999. Between 1999 and 2016, in addition to his work with DB Squared and the Johansons, Oliver consulted with around sixty clients.

19. DB Squared did not issue any W-2 forms to Oliver. Instead, DB Squared issued IRS form 1099s to ACT. DB Squared deducted no payroll taxes and provided no employment benefits to Oliver during his work for them.

20. Oliver worked from home approximately 3 days a week, usually spending only two days in his office at DB Squared.

21. ACT issued invoices to Johanson Consulting and, later, DB Squared for Oliver's services. (Pl. Exs. 62, 65). DB Squared's profit and loss statements show that Oliver's compensation was classified as expenses for "consulting services."

22. DB Squared provided the instrumentalities and tools used by Oliver and other programmers to develop the software. The software code and data were located on DB Squared computers and servers.

23. In fact, emails in the record show that even ACT's website and Oliver's ACT email account were hosted on DB Squared servers. (Pl. Ex. 105).

24. As the individual among the original three with computer programming expertise, Oliver was responsible for changing the computer code so that the JESAP and later DBCompensation products would display the following notice: "© DB Squared, LLC."

25. Throughout his tenure with DB Squared, Oliver occupied a number of positions, including Chairman, Chief Technology Officer, and Vice President of Product Development and Information Technology. In these roles, Oliver did more than just develop software. For instance, Defense Exhibit 6 is an email where Oliver indicates his desire to transition into providing board-level leadership service versus the hands-on software development services he was currently providing. Oliver also took

the lead in working with Modthink, a marketing company that partnered with DB Squared to help with its development goals. (Def. Ex. 12).

**Chris Devine**

26. At some point in 2006, another computer programmer, Chris Devine, was hired to assist with the development of the software. Chris Devine was (initially) paid through ACT, which deducted no employment taxes and provided no insurance benefits to Devine. Devine was introduced to DB Squared by Oliver and interviewed for his position at DB Squared headquarters. At the conclusion of the interview, the three owners of DB Squared discussed Devine and determined that he would be suitable to assist with computer programming and software development. Devine began work on the computer software in early 2007.

27. Chris Devine also owned a company, Vista Engineering (later Cyberdyne Systems). Devine was paid, like Oliver, through this wholly-owned company. Devine became the Senior Systems Engineer for DB Squared, LLC. Following Oliver's resignation, Devine was paid directly by DB Squared.

28. An alleged agreement, dated June 27, 2006, between Dale Oliver/ACT and Chris Devine/Vista, specifying that Devine is an independent contractor and that all intellectual property developed by Devine was the property of ACT, was not signed. (Pl. Ex. 99). Although Devine remembers having email conversations with Oliver about this agreement (Pl. Ex. 100), he does not recall signing the agreement. No signed version of the agreement was ever produced.

29. ACT issued invoices to DB Squared for Devine's services. (Pl. Ex. 62).

30. Despite Oliver's contentions that he directed all of Devine's work, the evidence also shows that Devine received substantial direction from the Johansons. For instance,

in October 2016, Devine sent an email to Bruce asking what Bruce/Blair would prefer that he work on—DBCompensation 10 or LTL/WM vendor project. (Pl. Ex. 97).

### Software Development Post-Hiring of Chris Devine

31.  The software modification logs for DBCompensation show that both Devine and Oliver made numerous changes and additions to the software, beginning with DBCompensation 6. (Def. Ex. 34; Pl. Exs. 21, 29, 30, 33).

32.  According to Oliver in an email to a client, Devine developed the Web components for the system and would be the most knowledgeable about how the system works, how it can be configured, and any security considerations. That email also explains that Devine is "our senior developer." (Def. Ex. 38).

33.  However, the greater weight of the testimony revealed that Devine's programming work on JESAP was minimal. There were no modification logs from which to ascertain the extent of his programming work until the later versions of the DBCompensation software.

34.  Devine estimated that 97-99 percent of the coding on "form main" of the DBCompensation software was completed by Oliver. "Form main" is a landing page of sorts for the computer software. The testimony at trial supports the conclusion that "form main" existed in some form since the early versions of the software and was not a brand-new invention for the DB Comp 10 program. Nevertheless, the computer code that composes the DB Compensation 10 software contains much more than just "form main." It is composed of some 87 forms and numerous modules.

### Oliver's Resignation and Subsequent Registration of DBCompensation Copyright

35.  On October 24, 2016, Dale sent an email, resigning from his position as CTO of DB Squared. (Def. Ex. 2).

36. Blair Johanson responded via email on October 25, 2016, explaining that he understood Oliver's frustration with finalizing the newest version of the DB Compensation software (DBComp 10) but hoped that they could resolve their differences. He asked if he could discuss the resignation with Oliver. (Def. Ex. 2).

37. On October 28, 2016, the company sent a letter to Oliver explaining that the Company no longer considered him a one-third owner. (Pl. Ex. 38).

38. On October 30, 2016, Oliver sent another email apologizing for his reaction the week before. In that email, he noted that he was trying to finalize the DB Comp 10 software and would be happy to continue to oversee the testing, implementation, and conclusion of the software. His note also indicated that once the DB Comp 10 program was rolled out, he saw it as an excellent opportunity to "let Blair and Bruce take it from here." He also noted that DB Squared is at a terrific place. (Def. Ex. 1).

39. On November 1, 2016, Blair Johanson responded that the company felt that it could continue with the DBComp 10 to-do items without Oliver's assistance.

40. On February 15, 2017, Oliver filed a second copyright application. Although he claims that he intended the registration to cover only a portion ("form main") of the new software DBComp 10, the registration application is for "DB Compensation." Moreover, Oliver later claimed ownership to all the software at issue here. Oliver's application did not explain that DBComp10 was just the latest version of the DBCompensation software first created and sold in 2009. The application lists Oliver as the sole author of the DBCompensation software. Oliver's application stated that the year of completion was 2016 and the date of first publication was October 5, 2016. (Pl. Ex. 18). While this might have been true had the application been only for

the new code in DB Comp 10, it was not true of the substantial majority of the code that remained the same between DB Comp 10 and the earlier DB Compensation and JESAP programs.

41. Oliver altered the native code in DBComp10 to insert the following "AUTHOR: DALE OLIVER" into the code before submitting it along with his new registration application. (Def. Ex. 46).

42. Examples of portions of code that were submitted with the DBCompensation copyright application include:

> "Please contact your system administrator or DB Squared for help resolving this issue."

> "We're sorry, but your DBCompensation licensing status cannot be determined. Please try to run the program again and if you continue to get this message, please call DB Squared at XXX-XXX-XXXX. We appreciate having you as a valuable DB Squared customer."

(Def. Ex. 46).

43. The portion of the DBCompensation code Oliver submitted included more than just "form main." It also included pages showing scatter graphs and the page of the software where each of the factors was listed (including the particular value to be assigned to each factor). (Def. Ex. 46).

44. Oliver never disclosed to the U.S. Copyright Office that the DBCompensation 10 software shared code with the JESAP and earlier DBCompensation software programs and that Devine had written much of this code alongside Oliver. For instance, he claimed that "DBCompensation," the software he was claiming, had

been first used in 2016. At no point did he explain that "DBCompensation" programs had existed since 2009 and that the latest version of the software was not entitled "DBCompensation" but rather "DBCompensation 10." The omission of any disclaimers, limitations on claim, mention of other authors of the code, or disclosures of these pre-existing works is particularly striking given that he personally completed the copyright application for the JESAP 2008 program, specifically indicating that the scope of the 2008 claim was for new and revised computer text and that the JESAP 2008 program was a new version of prior works completed in 2001 and 2005. Given these omissions, the Court finds by a preponderance of the evidence that Oliver made many knowing omissions and misrepresentations in his copyright application for "DBCompensation."

45. On February 21, 2017, the U.S. Copyright Office approved and issued Copyright Registration TX 8-299-255 entitled "DBCompensation" to Oliver.

46. Oliver subsequently sent a cease-and-desist letter to DB Squared and the Johansons regarding the DBCompensation software, demanding that they immediately stop using the software.

**Financial Health of DB Squared**

47. DB Squared's profit and loss statement (Pl. Ex. 57) shows around $954,000 paid to ACT by DB Squared from its inception in 2005 through 2016. Those payments are listed in the "Consulting" row of the profit and loss statement.

48. In addition, it shows the net income of the company varying considerably, with only 3 out of the 12 years showing a negative net income.

# B. CONCLUSIONS OF LAW

**1. Dale Oliver worked as an independent contractor from 2001-2005 when he created the initial JESAP software versions (JESAP 2001, JESAP 2005).**

To determine whether an individual was an employee or independent contractor, the Supreme Court has instructed that courts should consider factors such as: the skill required, the source of the tools used, the location of the work, the duration of the relationship between the parties, whether and to what extent the hiring party had the right to control or otherwise assign additional work or duties to the individual, the method of payment, whether the work was part of the regular business of the hiring party, and the tax treatment of the party. *Reid*, 490 U.S. at 742-43. The evidence at trial indicates that Oliver worked, as early as 1999, for his wholly-owned company, ACT, on a variety of projects for a variety of clients. He was never paid employment benefits by these clients, was treated like an independent contractor (1099s) throughout this period, and he worked at his own pace on the projects (often from home). He was specifically brought on to complete discrete projects that utilized his expertise in computer programming. Indeed, his testimony was that software development was the principal reason why clients used his services. Johanson Consulting brought him on to develop a software program because computer programming was foreign to them. Given these factors, the Court concludes that Oliver was an independent contractor when he began working on the JESAP 2001 and JESAP 2005 programs.

**2. Because Oliver created the works as an independent contractor, the Copyright Act vests the copyright in those unregistered works in him because the works cannot be considered joint works and because they were not works for hire.**

An attractive yet ultimately unavailable conclusion is that the earlier versions of the JESAP program themselves were joint works created by Oliver and the Johansons. The

attractiveness of this option stems from the fact that all three individuals would be considered joint authors, with each holding an undivided interest in the copyrights to those works. *Nimmer on Copyright* § 6.03. As such, the competing claims of copyright infringement could be resolved in one fell swoop as the law is clear that "an action for infringement between joint owners will not lie because an individual cannot infringe his own copyright." *Weissman v. Freeman*, 868 F.2d 1313, 1318 (2d Cir. 1989), *cert. denied*, 493 U.S. 883 (1989).

However attractive this option would be, the Court finds that it is ultimately unsupported by extant law. Under 17 U.S.C. § 101, a joint work is defined as a "work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." The reason this option for resolving the competing claims of copyright infringement is unavailable lies in the fact that the Johansons, creators of the JESAP methodology that was later incorporated into the various versions of the software, did not intend at the time their work was created for it to ultimately be incorporated into a software program. The classic example of a joint work under the Copyright Act is a lyricist who creates the words to a song intending that some individual composer will later create the score incorporating those words. *See, e.g.*, *Brownstein v. Lindsay*, 742 F.3d 55, 65 (3d Cir. 2014). In that case, at the time each author made the contribution that was incorporated into the unitary work (the song with words), each intended that his work would be combined with the other's contributions to form a unitary whole. *See, e.g.*, *Nimmer on Copyright* § 6.02 (noting that a joint work exists "[w]here the common design for a joint work is preconcerted *prior to either author's*

*creation of his contribution*") (emphasis added).[7] The same cannot be said here, where the Johansons were employing their job evaluation program, which was created and reduced to a tangible form of expression long before the thought of automating the process and methodology came to mind. Thus, while a persuasive argument could be made that Oliver's contributions were created with an eye to incorporating the pre-existing Johanson methodology (*i.e.*, at the time he created the source code which was ultimately registered with the Copyright Office, he intended that his contributions would incorporate and merge together with the Johansons methodology to create the JESAP software), the same cannot be said for the Johansons. *See Nimmer on Copyright* § 6.06 (noting that "a joint work does not result, where at the time of creation by the first author, the second author's contribution was not envisaged as an integrated part of a single work").

Because the initial versions of the JESAP program (2001 and 2005) cannot qualify as joint works, what the Court is left with are two versions of software code created solely by Oliver that incorporate the Johansons' methodology. These programs were never registered with the Copyright Office, so there are no registration certificates to establish a presumption of ownership under 17 U.S.C. § 410(c).

---

[7] The closest support the undersigned found to classify JESAP 2001 and JESAP 2005 as joint works under the Copyright Act came from the *Brownstein* decision. There, the Third Circuit held that plaintiff, who was responsible for writing the computer code used in a computer program that implemented rules for identifying the ethnicity of proper names, and defendant, who created the rules to be used in the program, were joint authors. There, however, the parties agreed that they were joint authors for the majority of their relationship, contemplated that their contributions would be merged, and there was a much closer temporal proximity between the creation of the two parts (software code and rules) that formed the unified computer program. Given these differences, and the fact that none of the parties here contend that the JESAP software was a joint work, the Court concludes that this case is distinguishable and should not compel a conclusion that the early JESAP programs were joint works.

Had these two versions of the software not been created, the Court would be dealing with a different situation where the first code at issue was a registered version of computer program code and where such registration would have conferred a presumption of validity that it was indeed owned by the entity (DB Squared) listed on the certificate. Instead, the Court has two prior, unregistered versions of the software code.

The first question then becomes who owns the copyright to those two versions of the software code. Pursuant to 17 U.S.C. § 201, "[c]opyright in a work protected under this title vests initially in the author or authors of the work." An exception to this general rule is where the work is made for hire. A "work made for hire" is defined as:

> (1)    a work prepared by an employee within the scope of his or her employment; or

> (2)    a work specially ordered or commissioned for use as a contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101(1)-(2).

According to the Supreme Court, "[t]o determine whether a work is for hire under the Act, a court first should ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor. After making this determination, the court can apply the appropriate section of § 101." *Reid*, 490 U.S. at 750-51.

Here, the evidence shows that the earliest versions of the JESAP software (2001 and 2005 versions) were created by Oliver while he served as an independent contractor. In the absence of a contrary registration (or concomitant presumption of ownership), the Court finds that Oliver was the author of the copyrighted computer code for JESAP 2001 and JESAP 2005. He was the one who took the proprietary methodology that had

previously been computed by hand and created the computer code necessary to automate the process.

Next, the Court finds that there are no compelling grounds under which his copyright in those two versions of the software code could have been owned by any other person or entity by virtue of the work for hire doctrine. They certainly cannot be considered works for hire of the company DB Squared, because that LLC was not created until 2006, years after the first version of the software was created. *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 591 (7th Cir. 2003). An argument could theoretically be made that Oliver created the works as works for hire for Johanson Consulting, but the Johansons certainly did not advance that argument and the Court finds no support for it given the evidence at trial. Rather, the evidence shows that Oliver initially did consulting work for the Johansons alongside his work with several other entities, that he was paid through his wholly-owned company ACT, that he received no insurance or employment benefits, that he was treated as an independent contractor for tax purposes, and that he did this work largely on his own, often at home, and without much in the way of direct supervision from the Johansons. These considerations all support the Court's conclusion that Oliver was working as an independent contractor at the time he created the initial versions of the JESAP software.

Because he was an independent contractor, the work can only be considered made for hire if there was an agreement in writing between the parties that the work should be considered a work made for hire. There is no evidence of any written agreement between Oliver and Johanson Consulting about the treatment of the JESAP 2001 and

JESAP 2005 programs. Pursuant to 17 U.S.C. § 201, copyright in the JESAP 2001 and JESAP 2005 programs vested in Dale Oliver.

**3. Oliver has rebutted the presumption of ownership that attaches to the JESAP 2008 Copyright Registration by persuasively showing that it does not qualify as a work for hire under the Act.**

Pursuant to 17 U.S.C. § 410, "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." This extends to the statement that the work in question was made for hire. *See, e.g.*, *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F. Supp. 2d 627, 647 (S.D.N.Y. 2011) (noting in a situation where company produced registrations listing works as "works for hire" that opponent "bears the burden of proving the works were not 'made for hire'"); *Autoskill Inc. v. Nat'l Educ. Support Sys.*, *Inc.*, 994 F.2d 1476, 1487 (10th Cir. 1993) (same), *cert. denied,* 510 U.S. 916 (199).[8] Of course, 17 U.S.C. § 410 only creates a rebuttable presumption which, by definition, may be rebutted by contrary evidence. *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 668 (3d Cir. 1990) ("The presumption flowing from § 410(c) is not an insurmountable one, and merely shifts to the defendant the burden to prove the invalidity of the plaintiff's copyrights."); *Nimmer on Copyright* § 12.11 ("Once the Register of Copyrights has issued a certificate, although certain *prima facie* presumptions are thereby created, the courts are free to examine the underlying facts and to rebut those presumptions, should the facts so warrant.").

---

[8] This case was overruled on different grounds by *TW Telecom Holdings, Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (2011).

Here, the Register of Copyrights issued a certificate of registration for TX 6-942-486 for the JESAP 2008 software. Because Oliver had represented to the Copyright Office that the work should be marked as made for hire, the author of the copyright is listed as DB Squared. Therefore, the certificate of registration creates a *prima facie* presumption that DB Squared is the author of the copyright, and the individual challenging that authorship, Oliver, bears the burden of rebutting that presumption.[9] Since DB Squared is only considered the author of the JESAP 2008 copyright by virtue of the work for hire designation, the presumption may be rebutted if the evidence shows that the works were not made for hire.

The Court has already explained why the relevant agency factors support the conclusion that Oliver was an independent contractor with the Johansons from 2001-2005. So, the next logical question is what, if anything, changed in 2008 when the JESAP 2008 software was being registered? One possible answer is the creation, in 2005, of DB Squared. Nevertheless, despite the formation of this LLC by Oliver and the Johansons, the Court ultimately finds that the agency factors still compel the conclusion that Oliver was an independent contractor during the period when the JESAP 2008 software code was created.

Of course, some of the agency factors point toward an employer-employee relationship. For instance, Oliver was not only a founding member of DB Squared but

---

[9] The Court has not found, nor have the parties cited, a similar case where an individual who was singularly responsible for the registration of the copyright in favor of another entity subsequently seeks to challenge that entity's authorship/ownership of the copyright. Therefore, there is nothing before the Court to suggest that this fact would prohibit Oliver from contesting ownership of the copyright just as any other party could.

began to assume various roles within the organization, such as Chair, Vice-President, and Chief Technology Officer. In addition, DB Squared was formed with the express purpose of improving and making commercially viable the software program (JESAP 2008 and later DBCompensation) that Oliver was creating for the company. After the registration of the copyright, Oliver was also the individual responsible for inserting the copyright notices in favor of DB Squared into the software code he created. The software code was also stored on DB Squared servers, maintained and licensed by DB Squared, and created using DB Squared equipment. Finally, the duration of the relationship (from 2001 to 2016) is indicative of an employer-employee relationship.

Nevertheless, most of the other factors, including those often cited as being heavily indicative of one's status as an independent contractor, favor the opposite conclusion.

At no point from the time he began working on the software up until 2008 (or, really, up until he resigned in 2016) was Oliver ever a W-2 employee; rather, he was consistently treated for tax purposes as an independent contractor, receiving a 1099 form every year. He also received no employment benefits from DB Squared and had no payroll taxes deducted. As the Eighth Circuit noted in *Kirk v. Harter*, the failure of DB Squared to provide employment benefits or withhold any payroll taxes is especially significant and highly probative evidence of one's status as an independent contractor as "every case since *Reid* that has applied the test has found the hired party to be an independent contractor where the hiring party failed to extend benefits or pay social security taxes." 188 F.3d 1005, 1008 (citing *Aymes v. Bonelli*, 980 F.2d 857, 863 (2d Cir. 1992)).[10] DB

---

[10] It seems that the Second Circuit's statement in *Aymes* is no longer accurate, as the parties spent a good deal of time in their briefings discussing a recent Ninth Circuit case, *JustMed v. Byce*, which determined that an individual was an employee despite his tax

Squared paid Oliver directly through his wholly-owned firm ACT after Oliver submitted monthly invoices for his services (as opposed to using a time clock at DB Squared). DB Squared's profit statements show that Oliver's remuneration was considered to be for "consulting services" rather than for the prototypical wages or salary that an employee would receive. These factors all highly favor the conclusion that Oliver was an independent contractor. *Id.* at 1008.

Oliver also, unlike typical employees, continued his consulting business on the side, working with approximately sixty other clients during this time in addition to his work for Johanson Consulting and later DB Squared. That too suggests that he was an independent contractor. *Berger Transfer & Storage v. Cent. States, Se. & Sw. Pension Fund,* 85 F.3d 1374, 1380 (8th Cir. 1996).

While the Johansons gave input on the software creation, they had no computer programming experience, which meant that it was Oliver, later assisted by Chris Devine, who was responsible for creating the code to drive the software programs. The highly skilled nature of the work is indicative of independent contractor status. *Aymes,* 980 F.2d at 862.

After considering the relevant agency factors, the Court concludes that Oliver was an independent contractor during the time he created the JESAP 2008 software. Because he was an independent contractor, his contributions can only qualify as a work for hire if

---

treatment. 600 F.3d 1118, 1128 (9th Cir. 2010). However, while *Byce* is a great reminder that no single factor in the analysis is dispositive, it does not alter the Court's conclusion here, as the individual in *Byce*, unlike here, was hired to replace an employee (and paid the same salary that his predecessor earned) and ultimately received and completed a W-4 form to have taxes withheld from his pay. The muddled tax treatment of Byce, unlike the consistent treatment of Oliver here for the duration of the fifteen-year relationship, is a significant factor distinguishing that case from the case at bar.

the JESAP 2008 software qualifies under 17 U.S.C. § 101(2). *See Reid*, 490 U.S. at 753. That section requires that the work be one of a specifically enumerated list of nine categories *and* that the "parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101(2). There is no express written agreement between Oliver and DB Squared that the JESAP 2008 software should be considered a work made for hire.[11]

Given these conclusions, Oliver has sufficiently rebutted the presumption that the JESAP 2008 software was a work for hire. By more than a preponderance of the evidence, Oliver has demonstrated that he created the software as an independent contractor and that the work cannot qualify as a work made for hire.

**4. The evidence does not demonstrate that Chris Devine's work on the JESAP 2008 software program created a joint work within the meaning of the Copyright Act.**

As noted above, the Copyright Act defines a joint work to be "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." Although the Eighth Circuit does not appear to have weighed in on the requirements for a joint work within the meaning of copyrights

---

[11] The Court finds as a matter of law that Oliver's written email to the U.S. Copyright Office does not satisfy the express agreement provision of 17 U.S.C. § 101(2) because that writing was between Oliver and the U.S. Copyright Office. The statutory language, however, requires an express agreement be signed by all parties. Therefore, it appears that Oliver's unilateral statement to the U.S. Copyright Office is insufficient to meet this requirement. The Court has also been presented with no authority where a similar statement to the U.S. Copyright Office was sufficient under 17 U.S.C. § 204 to serve as a transfer of copyright ownership, which generally requires that "the *parties* must state in writing that they intend to transfer a copyright." *Saxon v. Blann*, 968 F.2d 676, 680 (8th Cir. 1992) (emphasis added). Oliver's placement of copyright notices in favor of DB Squared into the computer software is also insufficient to establish a transfer. *Brooks v. Bates*, 781 F. Supp. 202, 206 (S.D.N.Y. 1991).

in software code, persuasive authority from other circuits suggests that the statutory intent required to create joint authorship "exists when the putative joint authors intend to regard themselves as joint authors . . . It is not enough that they intend to merge their contributions into one unitary work." *Papa's—June Music, Inc. v. McLean*, 931 F. Supp. 1154, 1157 (S.D.N.Y. 1996), *citing Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir. 1991).

The evidence at trial showed that Chris Devine was hired to work on DB Squared projects in 2006. However, his first coding work on any of the software at issue here came in 2007. Unlike with the later versions of the DBCompensation software, however, the parties did not introduce sufficient evidence as to what Chris Devine's contributions to the JESAP 2008 program's code were. The most direct evidence at trial was an email from Oliver to a prospective DB Squared client where Oliver notes that "Chris developed the Web components and is the most knowledgeable when it comes to how that portion of the system works." (Def. Ex. 38). However, not much in the way of explanation was offered as to what portion of the JESAP 2008 software code those Web components entailed. In fact, Oliver's testimony was that those components were not incorporated into the JESAP code base that was copyrighted in 2008 *at all*. Whoever is right on this score, the Court finds insufficient evidence to hold that Chris Devine is a co-author of the JESAP 2008 copyright with Oliver or that the JESAP 2008 program qualifies as a joint work under the Copyright Act.

5.  **Because Oliver was an independent contractor when he wrote the code that was ultimately registered as the JESAP 2008 software program and because Chris Devine cannot be considered a joint author and JESAP 2008 cannot be considered a joint work, Oliver owns the copyright to the JESAP 2008 program.**

Notwithstanding the JESAP 2008 Certificate of Registration, Oliver has demonstrated that he was working as an independent contractor when he created the

JESAP 2008 software code, the latest iteration in the JESAP software first created in 2001. The evidence supports Oliver's contention that the registration of the JESAP 2008 software incorrectly listed the work as a work made for hire. Because he has rebutted the presumption that DB Squared owned the JESAP 2008 copyright by virtue of it being a work for hire, the Court finds as a matter of law that Oliver is the correct author of the JESAP 2008 copyright.[12]

The Court agrees that the result of the above analysis seems inequitable and harsh. Nevertheless, copyright authorship is determined not be weighing equities but by following the statutory requirements of the Copyright Act. Because Oliver was the author of the JESAP works—both registered and unregistered—he is the owner of the copyrights that inhere in those works. This case illustrates, perhaps better than any could, the dangers of not formalizing through written agreements or hiring contracts the authorship and scope of intellectual property created by hired individuals. While equitable considerations will not prevent Oliver from contesting ownership of the copyrights in question, they will, as the Court concludes below, estop him from prevailing on a copyright infringement claim against DB Squared.

---

[12] It is important to bear in mind the distinction between the statutory formality of registration of a copyrighted work and the inception of protection for a copyright. Registration is not a pre-requisite to owning a copyright. Indeed, "copyright automatically inheres in a work the moment it is created, which is to say when it is fixed in a copy or phonorecord for the first time." *Nimmer on Copyright* § 7.16. Therefore, as a conceptual matter, there is nothing about the registration of a copyright that prevents another from asserting that it is the true owner of that copyright pursuant to the Copyright Act or a court from holding that a copyright is invalid, even in the absence of fraud. *Brownstein*, 742 F.3d 55, 77 ("A federal court's finding that a copyright is invalid, on the other hand, is a determination of *ownership* which does not disturb the registration of a copyright.").

### 6. DBCompensation 10 is a derivative work.[13]

The Copyright Act defines a derivative work as a:

work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization . . . or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'

17 U.S.C. § 101.

The testimony at trial, including from every party witness and from the two experts, Michael Paladino and Chuck Easttom, establishes that DBCompensation 10 software is a derivative work, relying heavily on the early features and coding in the JESAP software programs and the early DBCompensation programs (especially DBCompensation 6-9). In short, DBCompensation 10 is substantially similar to the JESAP software. The evidence at trial revealed that, from the software code down to the functionality of the two programs, much of the code comprising the works are substantially similar. Particularly persuasive to the Court on this point is the wide swath of code, functions, and layouts that remain virtually unchanged from the initial JESAP 2008 program. On this point, the Court finds Easttom's expert testimony to be especially relevant and more credible than Paladino's, and it finds Oliver's claim that "form main" was an entirely new feature in DB Comp 10 to be unsupported by the greater weight of the evidence.

---

[13] Pursuant to the Copyright Act, the different versions of the software in question constitute separate works. *See* 17 U.S.C. § 101 ("[W]here a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.").

**7. DBCompensation 10 is a joint work under the Copyright Act, and Devine is a joint author with Oliver.**

As noted above, a "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole. 17 U.S.C. § 101. The consequence of a joint work is that "each contributor automatically acquires an undivided ownership in the entire work . . . ." *Words & Data, Inc. v. GTE Commc'ns Servs., Inc.*, 765 F. Supp. 570, 575 (W.D. Mo. 1991) (quoting *Nimmer on Copyright* § 6.03). Of course, the statute requires that each author have the "intention, *at the time the writing is done*, that the parts be absorbed or combined into an integrated unit, although the parts themselves may be either inseparable (as in the case of a novel or painting) or interdependent (as in the case of a motion picture, opera, or the words and music of a song)." *Id.* (internal quotation marks and citation omitted).

The evidence at the trial overwhelmingly demonstrates that Oliver and Devine were the two authors who wrote the code for the DBCompensation 10 software. The modification logs submitted by both parties, the authorship "watermarks" in the code, and the undisputed contributions that both made towards what would become an inseparable and interdependent whole more than suffices to qualify for joint authorship.

Oliver contends that Devine cannot be considered a joint author of the DBCompensation 10 software because he did not ever consider himself to be the author. Oliver mistakes the testimony at trial and conflates the distinction between authorship and ownership of the software. At several points during his time in the witness box, Devine repeatedly referred to himself as an author of the code used in the DBCompensation software program. In fact, he expressly claimed to be the author of several of the new forms in the DBCompensation 10 software. He also stated that the DBCompensation 10

software had several other "authors," including Sean Pesaru and ProWorks. At no point did Devine disclaim that he authored significant parts of the DBComp 10 code. What Devine *did* state is that he never viewed himself as the *owner* of the DBCompensation 10 software, but always believed that DB Squared was the owner of the software program. However, "[t]he parties need not be aware of the legal consequences of such a label." *Nimmer on Copyright* § 6.07. Just because Devine never viewed himself as the owner of the copyright to the DB Comp 10 code does not mean that he did not view himself as a co-author of the software code that created the program, even if that authorship meant that he, pursuant to the Copyright Act, *was* an owner of the copyright in the software code.[14]

Therefore, the Court finds that the evidence supports the conclusion that, at the time each made his contribution, both understood that their substantial and unique contributions to the code would be incorporated into one final product (DBCompensation 10).[15] Because the two were joint authors who together wrote the computer software code that became DBCompensation 10, each is entitled to an undivided ownership interest in the copyright that inheres in that code.[16] However, given the Court's prior findings that

---

[14] The Court finds Oliver's argument that Devine cannot be a joint owner of the copyright in the DBComp 10 software because he never manifested that intent to anyone ironic given that the testimony revealed that at no point until the filing of the present suit did *Oliver* ever claim to be an owner of the software.

[15] This is also why the Court concludes that Oliver's attempts to assert now that he was the sole author of the DBCompensation 10 software are unavailing and directly contradicted by the significant evidence of the joint contributions that both he and Chris Devine made to the software at issue, both knowing that their contributions were intended to be merged into a unitary creation.

[16] Of course, nothing prevents Devine from assigning his ownership interests to another.

DB Comp 10 is a derivative work, it bears emphasis that "[t]he copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." 17 U.S.C. § 103(b). Thus, Oliver still owns the copyright to the underlying work from which DB Comp 10 derived, but Devine and Oliver co-own the copyright in the derivative work DB Comp 10. *Greene v. Ablon*, 794 F.3d 133, 153 (1st Cir. 2015) ("We do have the fact here that an author of the joint work . . . is also the author of the relevant preexisting work. . . However, that coincidence does not affect the contours of the . . . copyright, nor does it upset the joint ownership arrangement described above. [A work] may be both joint and derivative, with [an author] alone owning the copyright in the underlying work . . . and co-owning the copyright in the derivative work with [another].").

In making this finding, the Court specifically rejects Oliver's argument that any intellectual property rights that belong to Devine were assigned via contract to Oliver. Despite what he claims, there is no evidence in the record of a written agreement ever being executed between Devine/Vista Engineering and Oliver/ACT. While there is an email between Oliver and Devine about a proposed agreement, the Court will not assume, especially given that Devine had no recollection of ever having seen the agreement until this lawsuit began (and certainly no recollection of having signed it), that he ever did so— especially given the consequences (potential loss of co-ownership to a copyright). The Copyright Act goes to great lengths to protect individuals from inadvertent transfer of their rights, and this Court will not water down those protections by holding that this un-signed agreement is enforceable against Devine.

Finally, this conclusion is unaffected by Oliver's copyright certificate. As noted previously, such a certificate usually bestows a presumption of validity on the facts stated therein, which in this case includes that Oliver was the sole author of the "DBCompensation" code that he claimed. However, this presumption does not compel the conclusion that he was the sole author to the copyright in the code for several reasons. First, there are reasons to doubt whether Oliver is entitled to the presumption in this case. Under 17 U.S.C. § 410(c), the presumption only attaches where the certificate is made before or within five years after first publication of the work to be copyrighted. Had the copyright registration been made only for the newly created code in the DBCompensation 10 software, he'd have a strong case. However, his copyright application did not on its face limit itself to DBComp 10—after all, the registration was for "DBCompensation," a program that first existed in 2009. The Court has also found that much of what he claims was new about the portions of the code he did attach to his copyright application, including "form main," was not new at all but had been used in a substantially similar or identical form stretching all the way back to the early DB Compensation and late JESAP programs. Therefore, there are good reasons to doubt that the certificate of registration was obtained within five years after the code was first published. For these reasons, the Court finds it unlikely that Oliver's certificate is entitled to the presumption of validity set out at 17 U.S.C. § 410(c).

Nevertheless, even if the presumption does apply and Oliver is presumptively the sole author, this presumption is rebuttable and, for the reasons noted herein, has been sufficiently rebutted by a preponderance of the evidence. The evidence significantly undermines Oliver's claim that he was the sole author of DB Comp 10.

Finally, as noted previously, "copyright registration does not establish the copyright, which attaches at the moment of creation." *Brownstein*, 742 F.3d at 67. In short, because Oliver and Devine were co-authors of the DB Compensation code, they each are entitled to share in the copyright to that code, notwithstanding Oliver's copyright certificate.

**8. In order to resolve Oliver's claim for copyright infringement, the Court need not reach the question of whether Oliver's certificate of registration is rendered invalid because of the numerous omissions and misrepresentations made in the application.**

As noted previously, "[a] certificate of registration constitutes prima facie evidence of the validity of a copyright and of the facts, including ownership and existence, stated in the certificate." *Taylor Corp. v. Four Seasons Greetings, LLC*, 171 F. Supp. 2d 970, 972 (D. Minn. 2001). Under 17 U.S.C. § 411, a certificate of registration must be obtained before an individual may commence a civil infringement action. A certificate of registration satisfies this requirement, "regardless of whether the certificate contains any inaccurate information" except in cases where "(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(1)(A)-(B). Thus, "[a]bsent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement." *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984). However, in instances where this type of inaccurate information is alleged, "the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(2).

Given the Court's factual findings earlier, the Court concludes that the evidence in this case of Oliver's numerous omissions and misrepresentations in his second copyright application is of the type that would normally trigger the Court's obligation to request advice from the U.S. Copyright Office about whether the true information, if known, would have caused Oliver's second copyright to be refused registration and, therefore, whether it would render his copyright registration invalid and insufficient to meet the statutory pre-requisite for bringing an infringement action. Nevertheless, the Court will decline to do so here because, assuming without deciding that Oliver's registration was not the product of fraud on the U.S. Copyright Office, the Court will explain below why Oliver is equitably estopped from prevailing against DB Squared for copyright infringement and why his conduct granted Defendants an implied license to continue using the software programs.

**9. The JESAP methodology is a protectable trade secret under Arkansas law.**

Under the Arkansas Trade Secrets Act ("ATSA"), a trade secret is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process" that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ark. Code. Ann. § 4-75-601(4). Arkansas courts have held that whether information constitutes a trade secret is governed by several factors:

(1) the extent to which the information is known outside the business;

(2) the extent to which the information is known by employees and others involved in the business;

(3) the extent of measures taken by [the owner] to guard the secrecy of the information;

(4) the value of the information to [the owner] and to its competitors;

(5) the amount of effort or money expended by [the owner] in developing the information; and

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Wal-Mart Stores, Inc. v. P.O. Market, Inc.*, 347 Ark. 651, 666-67 (2002).

Applying the facts noted above to this law, the Court concludes that the JESAP methodology is a protectable trade secret under the ATSA. The evidence demonstrated that the Johansons devoted a significant amount of time, effort, and resources (practically their entire careers) over the course of twenty years to refine and perfect their methodology, which had been used in their family's business since their dad first created the JESAP methodology in 1985. There is also no question that the JESAP methodology has tremendous value, not only to the Johansons' consulting business but also to DB Squared.

The parties, including Oliver who now seeks to challenge whether this qualifies as a trade secret, took a significant number of reasonable measures to guard the secrecy of the information. All clients were required to obtain licenses to use the software which incorporated the methodology. As the CTO of DB Squared, Oliver passcode-protected the computer code that contained the Johansons' algorithm (*i.e.* the specific values and weights assigned to each factor in the process). Oliver also required other computer programmers, most notably Devine, to enter into a confidentiality agreement before working with the software. Finally, there are numerous reports in the record where sample

job studies were labeled confidential out of fear that inadvertent disclosure would compromise the secrecy of the Johansons' methodology.

Despite Oliver's argument otherwise, the evidence does not show that any of DB Squared's clients would be able to reverse engineer the methodology. While it is true that the use of similar point-factor analysis by other groups such as the Hay Group means that some or even many of the factors used in the Johansons' methodology might be known (or discoverable) through reverse engineering, the evidence at trial was that nobody could obtain the specific values and weights that were unique to the Johansons' methodology. It is these specific values and the overall algorithms that qualify as trade secrets under the ATSA.

10. **Despite Oliver's sole ownership of the JESAP 2008 copyright and co-ownership of the DB Comp 10 copyright, Defendants are entitled to an irrevocable implied nonexclusive license to continue using the software.**

An implied nonexclusive license may be "granted orally, or may even be implied from conduct. When the totality of the parties' conduct indicates an intent to grant such permission, the result is a nonexclusive license." *Nimmer on Copyright* § 10.03. "The test most commonly used in determining if an implied license exists with respect to most kinds of works asks whether the licensee requested the work, whether the creator made and delivered that work, and whether the creator intended that the licensee would copy and make use of the work." *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 41 (1st Cir. 2010); *see also Asset Mktg. Sys v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008).

The evidence supports the grant of an implied nonexclusive license. It cannot be disputed that Oliver was retained to create and deliver software programs, initially to the Johansons for internal use in their consulting business, and later on behalf of DB Squared

for commercial sale to outside clients. He certainly did so. Thus, whether he granted an implied license depends upon whether "the creator intended that the licensee would copy and make use of the work." The evidence supports Defendants' argument that Oliver intended that Defendants could continue to make use of the software programs. Indeed, from his initial hiring in 2001 until his resignation in 2016, the evidence shows that Oliver intended that his work would be used, copied, and distributed. In fact, the testimony shows that Oliver often personally went to install versions of the software on clients' computers and attended trade shows advertising the product, all on behalf of DB Squared. He also inserted copyright notices in favor of the company into the code and programmed the software to prompt users having software issues to contact DB Squared. Even his resignation email noted that he was confident that DB Squared could successfully finish the roll-out of the newly created DB Compo 10 program. Thus, the Court finds that the greater weight of the evidence demonstrates that Oliver's conduct indicates an intent on his part for Defendants to be able to use the software programs he created, notwithstanding his ownership to the underlying copyright in those works. *Gagnon*, 542 F.3d at 757 (finding an unlimited implied license where "Gagnon delivered the software without any caveats or limitations on AMS's use of the programs . . . [and] programmed on-site at AMS on AMS computers to which key AMS personnel had access). Thus, considering the totality of the circumstances, the Court finds that Oliver's conduct throughout the duration of his relationship with Defendants supports the grant of an implied nonexclusive license to continue using the software.

Of course, the next question is whether such a license is revocable or irrevocable. In general, the law is clear that where consideration is paid, the license is irrevocable.

*Gagnon*, 542 F.3d at 757; *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 882 (5th Cir. 1997) ("[A] nonexclusive license supported by consideration is a contract."). The evidence at trial was that ACT was paid by Johanson Consulting and later DB Squared for Oliver's (and Devine's) computer programming work. Such remuneration paid to Oliver is consideration for the implied license to continue using the software these entities had requested. Therefore, because consideration exists, the implied license is irrevocable.

## C. THE REMAINING CLAIMS

Given the above findings of fact and conclusions of law, the Court can now resolve the remaining claims in this case.

### 1. DB Squared's Claim for Copyright Infringement of the JESAP 2008 Copyright

DB Squared's claim for copyright infringement of the JESAP 2008 Copyright against Oliver will be **DISMISSED WITH PREJUDICE**. A claim for copyright infringement requires the plaintiff to show "Plaintiff's ownership of the allegedly infringed work" and "Defendant's 'copying' of the copyrighted work." *Nelson v. PRN Prods.*, 873 F.2d 1141, 1142 (8th Cir. 1989). Thus, "[a] defendant will prevail in an infringement action . . . [where] the plaintiff has failed to establish by a preponderance of the evidence the required elements of ownership and copying." *Nimmer on Copyright* § 13.04. As the Court has explained above, DB Squared has not demonstrated by a preponderance of the evidence that it owns the copyright to the JESAP 2008 software. Although its certificate of registration constitutes *prima facie* evidence of its ownership, Oliver has rebutted that presumption and demonstrated that he is owner of the copyright under the Copyright Act. Oliver cannot be liable for infringing a copyright that he owns.

## 2. Oliver's Claim for Copyright Infringement

Oliver's claim for copyright infringement will also be **DISMISSED WITH PREJUDICE**. Even assuming (solely for purposes of this ruling) that the Register of Copyrights would not, if asked, advise that Oliver's material omissions and misrepresentations would have resulted in a refusal to register his copyright for the DB Compensation software code, the Court finds that Oliver is equitably estopped from bringing a copyright infringement action against DB Squared for its use of the DB Compensation software and that Oliver's conduct granted Defendants an implied nonexclusive license to continue using the software.

Initially, estoppel as a defense to a copyright infringement action may lie where a defendant can prove:

(1) The plaintiff must know the facts of the defendant's infringing conduct;

(2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it so intended;

(3) the defendant must be ignorant of the true facts; and

(4) the defendant must rely on the plaintiff's conduct to its injury.

*Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003).

All of the elements for equitable estoppel are met here. It is undisputed that Oliver was well-aware of DB Squared's allegedly infringing conduct. After creating the JESAP software programs, he himself is the one who registered the JESAP 2008 program with the U.S. Copyright Office (after the Registration Specialist explained to him the fact that a work made for hire results in the company owning the copyright). He then continued to work for the company for eight years, all the while inserting copyright notices in favor of the company into the new iterations of the software code. Even upon his resignation, he

did not demand that DB Squared cease using the software. Rather, he commented that he knew that the Johansons could pick up where he left off with the roll-out of DBComp 10. His behavior throughout his time with DB Squared clearly would have given DB Squared every right to believe that he intended them to continue using the newly finished DB Compensation 10 software.

The Court also finds that DB Squared and the Johansons were ignorant of the true facts (*i.e.* that Oliver claimed any ownership rights to the JESAP or DB Compensation software code or objected to DB Squared's continual use, improvement, licensure, or sale of the programs). *Archie Comic Publ'n*, 258 F. Supp. 2d 315, 326 (S.D.N.Y. 2003).

Finally, there is also no question that DB Squared relied on Oliver's conduct to its injury. After hiring Oliver to create these programs for its use, after paying him a substantial sum for his work, and after his years of actively representing to every licensed user (through the copyright notices) that the copyright belonged to DB Squared, Oliver's new claims of sole ownership come at great expense to DB Squared. *Slate v. Am. Broad. Co.*, 941 F. Supp. 2d 27, 43-44 (D.D.C. 2013) (discussing cases where courts found estoppel when copyright claimants had previously "rested" on their rights or led companies to believe that they had right to use products). The company spent years paying Oliver and Devine for their work, paid to rebrand the company (including applying for a trademark for the new software name and logo), and expended years of labor trying to develop the software to the point where the three of them could sell the business for a healthy profit.

The Court finds that this is a classic case where equitable estoppel should apply to prevent Oliver from prevailing against DB Squared or the Johansons on his claim of

copyright infringement. In addition, Oliver's grant of an implied license to Defendants to continue using the software is another reason why his copyright infringement claim should be dismissed. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996) (noting that "the existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement").

### 3. Defendants' Breach of Fiduciary Duty Claim against Oliver and Oliver's Breach of Fiduciary Duty Claim Against Defendants

The Court finds that the competing claims for breach of fiduciary duty should be **DISMISSED WITH PREJUDICE**. As to Defendants' breach of fiduciary duty claim, the evidence is clear that DB Squared and Defendants collectively, upon Oliver's resignation, asserted that his conduct resulted in a forfeiture of his one-third membership interest in the company that he had founded with the Johansons. The Court's Order on summary judgment determined that there was no such forfeiture under Arkansas law and that Defendants were wrong to assert such a position against Oliver. As such, Defendants should not be entitled to assert a breach of fiduciary duty claim against Oliver for his actions given their own wrongful conduct towards him. That claim will be dismissed due to the equitable doctrine of unclean hands. As to Oliver's claim for breach of fiduciary duty, a similar result applies. The Court finds that Oliver's conduct is a sufficient bar to any recovery he might otherwise be entitled to. After seeking to protect the Johansons' trade secrets for years through password protection and licensing agreements, his efforts to now use those same trade secrets for his own profit (as a result of his new copyright) constitute sufficiently inequitable conduct barring recovery. As noted above, Oliver's conduct also supports the Defendants' assertions of the defenses of estoppel and laches. At no point from Oliver's hiring until he filed this lawsuit did he provide any indication to

DB Squared or anyone else[17] that he claimed ownership to the copyrights to the software code or to any additional profits (beyond the distributions he was entitled to as a one-third owner of the company) earned by sale or licensing of the software. His failure to act for years bars his attempt to recover now.

### 4. Oliver's Claim for Unjust Enrichment

This claim, too, will be **DISMISSED WITH PREJUDICE**. Unjust enrichment under Arkansas law is "an equitable doctrine that allows a party to recover for benefits conferred on another. It is restitutionary in nature and focuses on the benefit received." *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (2009). However, the receipt of some benefit is not enough, for "[t]here must also be some operative act, intent, or situation to make the enrichment unjust and compensable." *Dews v. Halliburton Indus., Inc.*, 288 Ark. 532, 536 (1986).

The Court finds that Oliver has not met his burden of demonstrating an operative act, intent, or situation to make the enrichment unjust and compensable. Oliver identifies no such act, and the Court cannot find any given the evidence at trial. Oliver, through ACT, was compensated for his consulting work at DB Squared and his years of work on the software, and he has not met his burden of showing his entitlement to prevail on this claim. His belated attempt to claim that DB Squared's profits off the sale of software are somehow unjust is, for the reasons noted above, also barred by estoppel and laches. Of

---

[17] Devine's testimony was that, in all their years of working together on the computer software code, Oliver never expressed to him that he believed that he owned the copyright to the code.

course, nothing about this ruling forecloses Oliver's right to recover any unpaid distributions that he was entitled to as a one-third owner of DB Squared.

### 5. Defendants' Request for Permanent Injunctive Relief to Prevent Trade Secret Misappropriation[18]

Misappropriation of trade secrets under Arkansas law is defined to include:

[d]isclosure or use of a trade secret of another without express or implied consent by a person who at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

Ark. Code Ann. § 4-75-601(2)(B)(ii)(b) (cleaned up). Defendants argue that, should Oliver attempt to license or sell the JESAP or DBCompensation software, he would then have committed trade secret misappropriation since he knew that his knowledge of the Johansons' methodology was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

In response, Oliver contends that his ownership of the copyright to the software code allows him to fully exercise his exclusive rights to distribute the work notwithstanding the fact that there are embedded trade secrets in the code. In support of his position, he cites a single case, *Avtec Systems, Inc. v. Peiffer*, where a district court in Virginia was reversed on appeal after finding that an owner of a trade secret had a claim for trade secret misappropriation against an individual who was selling programs to which it owned the copyright. In reversing the district court, the Fourth Circuit noted that:

---

[18] Oliver argues as a preliminary matter that neither the Johansons nor DB Squared has standing to raise this issue since the trade secret is owned by Johanson Consulting. The Court is not convinced. It finds persuasive the reasoning of other courts that have, relying on similarly worded trade secret laws, held that even a licensee (here, DB Squared) of a trade secret has standing to sue for trade secret misappropriation. *Metso Minerals Indust. v. FLSmidth-Excel LLC*, 733 F. Supp. 2d 969, 977-979 (E.D. Wis. 2010).

Avtec offers no authority, and we have found none, for the proposition that the alleged "owner" of a trade secret could maintain the secrecy of material that is subject under federal law to publication at the will of another. We do not believe that a nonexclusive use license in copyrighted material can support the reasonable expectation or right of secrecy necessary to predicate a claim that the identical material is a trade secret protectable under Virginia law.

21 F.3d 568, 575 (4th Cir. 1994).

Although Oliver makes the argument that the facts in that case and in the case at bar should lead to the same conclusion, the Court finds that *Avtec* is distinguishable, for several reasons. First, the "trade secret" that Avtec claimed was not a pre-existing trade secret that it had licensed from the true owner. Rather, it claimed that it had an interest, "described variously as a trade secret, a license, and a right akin to the equitable shop rights of patent law—in the use of the [copyrighted work]." *Id.* Moreover, although Avtec had initially argued that Peiffer's conduct had misappropriated its trade secrets in the copyrighted program, in its client lists, and in its marketing techniques, it limited its appeal only to an argument about misappropriation of the program. Therefore, the Fourth Circuit expressly limited its decision to that aspect of its argument. *Id.* at 575 n.15. Here, however, the trade secret is not the program itself. Rather, it is pre-existing, licensed material that was incorporated into a copyrighted work only after the presumed original owner of that work entered into a licensing agreement with the creators (Johanson Consulting) to use it. That fundamentally differs from *Avtec* and compels a different conclusion. In short, the Court is not convinced that *Avtec* prevents the Court from enjoining Oliver from selling software, without license from Johanson Consulting, if doing so would—as the Court believes it would—involve misappropriating a trade secret. This is especially the case where Oliver insists that he can easily remove the Johansons' trade

secrets and instead substitute other point-factor analysis that is publicly available. The Court finds that injunctive relief is appropriate pursuant to Ark. Code. Ann. § 4-75-604(a).

Moreover, even if the Court is incorrect about the applicability of *Avtec's* reasoning and the owner of the copyright *is* entitled to the exclusive right to distribute its works notwithstanding that the copyrighted work contains an embedded trade secret that had been licensed from another—the Court finds that this justification does not compel the same conclusion about Oliver's continued use of the "DBCompensation" name. In short, the foundation of *Avtec's* holding is that the owner of a trade secret in a program cannot maintain the secrecy required for trade secret protection for that program when such material is "subject under federal law to publication at the will of another." *Id.* at 575. However, no matter the wisdom of *Avtec's* holding in relation to trade secrets, there is no basis for extending that holding to the unauthorized commercial use of a trademark. DB Squared, LLC owns the trademark in the word mark "DBCompensation" and logo, and the Court has been presented with no justification as to why Oliver's copyrights would allow him to continue using the word mark and/or logo without permission or licensure from DB Squared, especially if doing so involves direct competition with the owner of the mark.

Therefore, pursuant to Ark. Code Ann. § 4-75-604(a), the Court will enjoin Dale Oliver and any person or entity working at his direction or on his authority (such as his wholly-owned company ACT) from disseminating software unless he first removes the Johansons' trade secrets or obtains a license to use such trade secrets.[19] The Court will

---

[19] That section of the Arkansas code allows for a Court to enjoin both actual *or threatened* misappropriation of a trade secret.

not at this time issue an injunction as to Oliver's use of the DBCompensation name and logo since it has no basis on which to make findings as to whether injunctive relief would be appropriate under federal trademark law. *See* 15 U.S.C. § 1116. Nevertheless, it does seem likely that should Oliver attempt to sell the software using the DBCompensation word mark or logo, DB Squared would have a compelling case for the issuance of an injunction.

## 6. Declaratory Relief—Copyright Ownership

Given the Court's findings in this case, it now declares as a matter of law that Dale Oliver is the owner of the copyright in the JESAP 2008 software, and that Dale Oliver and Chris Devine are joint authors, and resulting joint owners, of the copyright in the DB Compensation 10 software.

## 7. Judicial Dissolution of DB Squared, LLC

The Arkansas statute governing judicial dissolution enables a court to dissolve a limited liability company "whenever it is not reasonably practicable to carry on the business of the limited liability company in conformity with the operating agreement." Ark. Code Ann. § 4-32-902. The Court has not found Arkansas case law addressing the situations where it would not be "reasonably practicable" to carry on the business of the LLC. Cases in other jurisdictions interpreting similar language conclude that judicial dissolution is an "extreme remedy." *Hershewe v. Givens*, 2015 WL 5829887, at *10 (M.D. Ala 2015) (quoting *Wiggs v. Summit Midstream Partners, LLC*, 2013 WL 1286180, at *2 (Del. Ch. 2013)).

The Court finds that Oliver has not met his burden of showing that judicial dissolution of DB Squared is warranted. Given the testimony at trial, the Court cannot find

that Oliver has demonstrated that it is not reasonably practicable to carry on the business of DB Squared. The testimony at trial revealed that the Johansons now understand that Oliver remained a one-third owner of DB Squared despite his resignation. They also testified under oath that they are willing to continue to work with Oliver on the success of DB Squared. The company's profit and loss statements from 2005-2016 also indicate that it has largely been a profitable and successful venture. Finally, despite his claims now, Oliver himself stated in his resignation email that DB Squared has a bright future ahead of it. Given this evidence, the Court finds insufficient grounds upon which to order the judicial dissolution of DB Squared.

As has hopefully become clear by now, the only way that the parties are likely to experience success with their software or business operations going forward is if they resume making decisions like they used to: together.

### III. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff Dale Oliver's claims for copyright infringement, breach of fiduciary duty, and unjust enrichment are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff Dale Oliver is **DECLARED** to be the owner of the copyright to the JESAP 2008 software code; and **IT IS FURTHER ORDERED** that Plaintiff Dale Oliver and Chris Devine are **DECLARED** to be joint authors and joint owners of the copyright to the DBCompensation 10 software code.

**IT IS FURTHER ORDERED** that Defendants' claims for copyright infringement and breach of fiduciary duty are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants' request for injunctive relief is **GRANTED**. Dale Oliver, and any person or entity working at his direction or on his authority, are **ENJOINED** from the distribution, use, or sale of software containing the Johansons' protected algorithms and job valuation methodology unless they obtain a license.

**IT IS FURTHER ORDERED** that the petition for judicial dissolution of DB Squared, LLC is **DENIED**.

Judgment will enter contemporaneously with this order.

**IT IS SO ORDERED** on this _21ˢᵗ_ day of November 2018.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE